# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES COMMODITY
FUTURES TRADING COMMISSION,

                **Plaintiff,**

**v.**                                            **Case No:  6:17-cv-256-Orl-37DCI**

GOLD CHASERS, INC., ROYAL
LEISURE INTERNATIONAL, INC. and
CARLOS JAVIER RAMIREZ,

                **Defendants.**

_____

# REPORT AND RECOMMENDATION

    This cause comes before the Court for consideration without oral argument on the following motion:

> **MOTION:**    **MOTION AND MEMORANDUM REQUESTING FINAL JUDGMENT BY DEFAULT (Doc. 59)**
>
> **FILED:**    **August 22, 2018**
>
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

## I.    Background

    On February 13, 2017, Plaintiff filed a Complaint against Defendants alleging that Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  Doc. 1.  Following numerous unsuccessful attempts to serve Defendants with the Complaint, Plaintiff filed a Motion for Service by Publication, which the Court denied without prejudice.  Docs. 10; 11; 13.

    On August 17, 2017, Plaintiff filed a motion for entry of Clerk's default against Defendants.  Doc. 29.  Thereafter, the Clerk entered default against Defendants and Plaintiff moved

for default judgment.  Docs. 30; 31; 32; 33.  However, on March 5, 2018, the Court entered an Order to Show cause why Plaintiff's motion for default judgment should not be denied without prejudice and why the Clerk's defaults should not be set aside for failure to properly serve Defendants.  Doc. 43.  Subsequently, the Court denied the motion for default judgment and set aside the Clerk's defaults.  Doc. 45.

On May 4, 2018, Plaintiff filed an Amended Complaint.  Doc. 50.  Following diligent attempts at serving Defendants with the Amended Complaint, Plaintiff again sought entry of Clerk's default against Defendants.  Doc. 53.  On August 3, 2018, the Clerk entered default against Defendants.  Docs. 56; 57; 58.

On August 22, 2018, Plaintiff moved for default judgment against Defendants.  Doc. 59 (the Motion).  Therein, Plaintiff asks the Court to enter a permanent injunction, award restitution, and impose a civil monetary penalty against Defendants.[1]  *Id.*

## II.    Factual Allegations

In the Amended Complaint, Plaintiff asserts the following well-pled factual allegations:

*The Parties*

1.      Plaintiff U.S. Commodity Futures Trading Commission (the Commission) is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 – 190.10 (2016).  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.  Doc. 50 at ¶ 7.

2.      Defendant Carlos Javier Ramirez (Ramirez) was, during the Relevant Period, a resident of Orlando, Florida.  Ramirez is the owner, President, Chief Executive Officer and

---

[1] Plaintiff provided the Court with a proposed order (the Proposed Order) via email.

registered agent of GCI and RLI.  Ramirez has never been registered with the Commission. Ramirez no longer resides in Florida and is concealing his whereabouts.  Doc. 50 at ¶ 8.

3.     Defendant Gold Chasers, Inc. (GCI) was a Florida corporation that had offices at 121 South Orange Avenue, Suite 1500, Orlando, Florida 32801-3241.  GCI was incorporated in December 2011 and administratively dissolved in September 2013.  GCI has never been registered with the Commission.  Ramirez is the only owner, director, and officer of GCI, and is the only person who could accept service of process on behalf of GCI.  Doc. 50 at ¶ 9.

4.     Defendant Royal Leisure International, Inc. (RLI) was a Florida corporation that had offices at 121 South Orange Avenue, Suite 1500, Orlando, Florida 32801-3241.  RLI was incorporated in August 2008 and administratively dissolved in September 2013.  RLI was also incorporated in Anguilla.  RLI has never been registered with the Commission.  Ramirez is the only owner, director, and officer of RLI, and is the only person who could accept service of process on behalf of RLI.  Doc. 50 at ¶ 10.

*Summary*

5.     During the Relevant Period, Defendants obtained at least $1.31 million from customers residing in the United States, Puerto Rico and abroad for the purpose of entering into contracts to purchase gold from GCI and RLI.  Doc. 50 at ¶¶ 2, 11.

6.     From at least February 14, 2012 through at least January 31, 2013, Ramirez, and agents operating on Defendants' behalf, fraudulently solicited customers residing in the United States to purchase gold, a commodity in interstate commerce, through GCI and RLI ("the GCI Scheme").  Thereafter, Defendants entered into agreements with their customers in which Defendants purported to sell their customers kilograms of gold and in which Defendants promised to pay profits on or before specific days.  Rather than buy gold for their customers, Defendants

used customer funds for their personal benefit and used newer customers' funds to pay false profits to some older customers, in furtherance of the GCI scheme, in the manner of a Ponzi scheme. Doc. 50 at ¶¶ 2, 11-12.

7.     From at least February 14, 2012 through at least January 31, 2016, Ramirez and RLI operated the MGD website, which offered gold to its customers for purchase ("the RLI Scheme"). Ramirez, and agents operating on behalf of Ramirez and RLI, solicited customers residing in the United States, Puerto Rico and abroad to purchase gold through the website www.mygolddesk.com (the MGD website). Thereafter, using the MGD website, Defendants purported to sell their customers ounces and kilograms of gold, promised to pay profits and issued false documents, including invoices that falsely stated that customers purchased gold from RLI. Doc. 50 at ¶¶ 2, 11, 13.

8.     As part of their fraudulent schemes, Defendants used the mails or other instrumentalities of interstate commerce to solicit and contact customers, to misrepresent material facts to their customers, to omit material facts that should have been disclosed to their customers in order to make their representations not misleading in the context in which they were made and to disseminate false account documents to their customers, including invoices that falsely stated that Defendants sold gold to their customers. Doc. 50 at ¶ 14.

*Defendants Misappropriated Their Customers' Funds*

9.     In connection with the GCI Scheme, Defendants obtained at least $832,001 from their customers. Defendants paid $173,169 in false profits to customers in furtherance of the GCI scheme. Therefore, Defendants misappropriated at least $658,832. Defendants used the remaining funds for their own benefit, including for Ramirez's personal expenses. Doc. 50 at ¶ 15.

10.     In connection with the RLI Scheme, Ramirez and RLI obtained at least $486,948 from their customers.  Ramirez and RLI used customers' funds for their own benefit, including for Ramirez's personal expenses.  Doc. 50 at ¶ 16.

11.     Therefore, during the Relevant Period, Defendants misappropriated at least $1,145,780.  Doc. 50 at ¶ 17.

12.     As a specific example of Defendants' misappropriation, on or about April 3, 2012, "Customer A," a customer of the GCI Scheme, transferred $48,104 to GCI's bank account for the purpose of purchasing gold through Defendants.  Beginning the next day and continuing through approximately April 12, 2012, Ramirez misappropriated at least $14,500 of Customer A's funds. Ramirez spent Customer A's money on himself, including approximately five purchases through Copa Airlines, approximately four purchases through www.hotels.com and a payment of approximately $3,500 to the Caesar Park Hotel in Sao Paolo, Brazil on or about April 11, 2012. Doc. 50 at ¶ 18.

13.     As an additional specific example of Defendants' misappropriation, on or about August 1, 2012, "Customer B," a customer of the GCI Scheme, transferred $52,010 to GCI's bank account for the purpose of purchasing gold through Defendants.  On the day of Customer B's purported purchase of gold, GCI's account was overdrawn and was incurring charges for insufficient funds.  On or about August 6, 2012, Ramirez misappropriated at least $3,600 of Customer B's funds by making purchases at a men's clothing store, a wine store, by paying Verizon $900, by paying Enterprise Rent-a-Car over $600, and by incurring a charge of approximately $335 at a business that touted itself as "the #1 strip club in Miami."  Doc. 50 at ¶ 19.

14.     During the Relevant Period, Defendants failed to disclose, and intentionally or recklessly omitted to disclose to Customers A and B and to the rest of their customers in both Schemes, that their funds would be misappropriated for Defendants' own financial benefit or for transfer to other customers in furtherance of the GCI Scheme.  Doc. 50 at ¶ 20.

> *In Connection with the GCI Scheme, Defendants Made Material False and Misleading Representations and Omissions*

15.     From at least February 14, 2012 through at least January 31, 2013, Ramirez, and agents acting on behalf of Defendants, fraudulently solicited at least eight United States customers to purchase kilograms of gold from GCI.  From at least February 14, 2012 through at least January 31, 2013, Ramirez, and agents acting on behalf of Defendants, told customers that:

a.     If customers bought one, two or four kilograms of gold, they would receive either a ten, fifteen or twenty percent profit every ten days;

b.     Ramirez travelled to Brazil, Mexico and other Central and South American countries to buy gold directly at gold mines for sale to Defendants' customers; and,

c.     There was no risk purchasing gold through Defendants' program. Doc. 50 at ¶ 21.

16.     Defendants entered into "Memoranda of Understanding" and Promissory Notes with customers, which stated that Defendants would:

a.     Buy gold at gold mines;

b.     Sell the purchased gold to Defendants' customers;

c.     Pay a profit to Defendants' customers by a specific day;

d.     Provide Defendants' customers with the opportunity to take physical possession of gold bars;

e.      Use the entirety of the funds transferred to them by their customers

to purchase gold on behalf of their customers; and,

f.      Sell gold to Defendants' customers at a price that was related to the

London Bullion Market Association's prices.

Doc. 50 at ¶ 22.

17.    From at least February 14, 2012 through at least January 31, 2013, Defendants

knew or should have known that:

a.      Ramirez did not buy gold at gold mines in Central and South

America;

b.      Of the $1,381,952 transferred to Defendants by customers of the

GCI Ponzi scheme, Defendants used only $291,487, to purchase precious metals,

contrary to Defendants' representations to their customers, including that

Defendants would use the entirety of the funds transferred to them by their

customers to purchase gold on behalf of their customers;

c.      Defendants never possessed a sufficient amount of gold that was

anywhere close to being able to honor their promises to sell gold to their customers,

or to pay bonuses to their customers;

d.      they would not be able to pay profits in the form of either gold or

cash to their customers because they never bought sufficient gold on behalf of their

customers;

e.      the documents they provided to their customers that stated that

customers owned gold held by Defendants were false because Defendants did not

purchase sufficient gold on behalf of their customers; and,

    f.  their customers' purchases were at risk because Defendants failed to disclose to their customers that Defendants did not have gold to sell to them and because Defendants failed to disclose that they were misappropriating newer customers' funds to pay false profits to some older customers and for Ramirez's personal expenses.

Doc. 50 at ¶ 23.

  18.  The following two examples illustrate the misappropriations and material misrepresentations and omissions that Defendants made in connection with the GCI scheme.

    <u>Customer A</u>

  19.  Between March and May 2012, Customer A, paid GCI approximately $133,000 for the purchase of three kilograms of gold.  Doc. 50 at ¶ 25.

  20.  Specifically, on or about March 30, 2012, Customer A entered into a Memorandum of Understanding ("MOU") with Defendants in which Customer A agreed to buy one kilogram of gold from GCI.  Accordingly, on or about March 30, 2012, Customer A transferred $48,104 to a bank account held by GCI and controlled by Ramirez.  In addition, in a March 30, 2012 e-mail, Ramirez told Customer A that, after ten business days, Customer A would receive either one kilogram of gold, or Customer A's purchase price plus ten percent, which was $53,449.  Doc. 50 at ¶ 26.

  21.  On or about March 30, 2012, Ramirez issued a Promissory Note ("PN") in which he promised to pay $53,449 in gold to Customer A by April 13, 2012.  Doc. 50 at ¶ 27.

  22.  On or about April 18, May 3 and June 4, 2012, Defendants used money transferred to them by other customers to pay false profits to Customer A, in the total amount of approximately $43,000, in furtherance of the GCI Scheme.  Doc. 50 at ¶ 28.

23.     Relying upon Ramirez's representations and the alleged profits paid by GCI, Customer A entered into another MOU with Defendants in which Customer A paid $84,933 to buy two kilograms of gold from GCI.  On or about May 18, 2012, Customer A transferred $84,933 to a bank account held by GCI and controlled by Ramirez.  Doc. 50 at ¶ 29.

24.     On or about May 18, 2012, Ramirez issued a second PN in which he promised to pay $99,922 in gold to Customer A by May 16, 2013.  However, even though Ramirez enticed Customer A to purchase gold by using a PN in which he promised to pay a significant profit to Customer A, Ramirez did not pay that profit.  Instead, Ramirez caused GCI to pay false profits to Customer A on June 4, 2012 as alleged above, and he misappropriated the remainder of Customer A's investments with GCI.  Doc. 50 at ¶ 30.

25.     On or about July 5, August 1, September 30, November 14 and November 17, 2012, Ramirez sent emails to Customer A promising that Customer A would receive the gold purchased. Doc. 50 at ¶ 31.

26.     In reality, during the Relevant Period, Defendants failed to purchase gold on behalf of Customer A, failed to deliver gold to Customer A, and instead misappropriated approximately $90,000 of Customer A's funds, which Defendants used to pay false profits to other customers and for Ramirez's personal expenses.  Doc. 50 at ¶ 32.

        Customer B

27.     Customer B entered into a MOU with Defendants in which Customer B agreed to pay $52,010 to buy one kilogram of gold from GCI.  On or about July 30, 2012, Customer B transferred $52,010 to a bank account held by GCI and controlled by Ramirez.  Doc. 50 at ¶ 33.

28.     On or about July 30, 2012, Ramirez issued a PN in which he promised to pay $62,413 in gold to Customer B by September 18, 2013.  Doc. 50 at ¶ 34.

29.     In late December 2012 or early January 2013, during a telephone call, Ramirez told Customer B that Customer B would receive a profit, that Customer B's principal was safe and that Customer B's purchase from Defendants carried no risk.   None of Ramirez's statements to Customer B were true.  Doc. 50 at ¶ 35.

30.     During the Relevant Period, rather than earning a profit or keeping Customer B's principal safe, Defendants misappropriated the entirety of Customer B's funds.  Doc. 50 at ¶ 36.

31.     Moreover, during the Relevant Period, Defendants failed to purchase gold on behalf of Customer B and failed to deliver gold to Customer B.  Doc. 50 at ¶ 37.

*In Connection with the RLI Scheme, Ramirez and RLI Made Material False
and Misleading Representations and Omissions and Issued False Invoices*

32.     From at least February 14, 2012 through at least January 31, 2016, Ramirez and RLI used the MGD website and individual agents operating on their behalf to fraudulently solicit at least 12 customers in the United States, Puerto Rico and abroad to buy gold from RLI.  Doc. 50 at ¶ 38.

33.     From at least February 14, 2012 through at least January 31, 2016, Ramirez and RLI, and agents operating on their behalf, made the following material false and misleading representations and omissions, including through the MGD website:

a.     The My Gold Desk gold-buying program was similar to Amazon and Ebay;

b.     By purchasing gold through Ramirez and RLI, and through the MGD website, customers could "[a]ccumulate more monthly than what you would in a CD [or] Savings account";

c.     "My Gold Desk gives private investors around the world access to the professional bullion markets"; and,

       d.     By purchasing gold through Ramirez and RLI, and through the MGD website, customers would receive a "20% free bonus" payable in gold.

Doc. 50 at ¶ 39.

       34.     From at least February 14, 2012 through at least January 31, 2016, Ramirez and RLI intentionally or recklessly failed to disclose, and omitted, that:

       a.     The My Gold Desk gold-buying program was not similar to Amazon and Ebay;

       b.     By purchasing gold through Ramirez and RLI, and through the MGD website, customers would not and did not accumulate more in a month than they would in a CD or savings account;

       c.     That customers who purportedly purchased gold through the MGD website did not have access to the "professional bullion markets"; and

       d.     That Ramirez and RLI would not pay bonuses or profits to their customers.

Doc. 50 at ¶ 40.

       35.     From at least February 14, 2012 through at least January 31, 2016, Ramirez and RLI caused the issuance of invoices to customers who bought gold through the MGD website, including as email attachments, that falsely claimed that customers purchased gold from RLI, that customers received bonuses from RLI and that RLI held gold on their behalf.  Doc. 50 at ¶ 41.

       36.     The following two examples illustrate misappropriations and material misrepresentations and omissions by Ramirez and RLI, and their issuance of false invoices, in connection with the RLI Scheme.

Customer C

37.    In January 2014, an agent acting on behalf of Ramirez and RLI told Customer C that the agent had earned profits by purchasing gold through Ramirez and RLI, and through the MGD website.  In January 2014, the agent also referred Customer C to the MGD website, and told Customer C that he would earn profits and a bonus by purchasing gold from Ramirez and RLI through the MGD website.  Doc. 50 at ¶ 43.

38.    On or about February 3, 2014, using the MGD website, Customer C and his spouse transferred $20,192 to RLI's bank account in Anguilla, controlled by Ramirez, in order to purchase sixteen ounces of gold.  Doc. 50 at ¶ 44.

39.    Despite receiving funds from Customer C, Ramirez and RLI failed to purchase gold on behalf of Customer C and failed to deliver gold to Customer C.  Doc. 50 at ¶ 45.

40.    Further, between March and December 2014, Ramirez and RLI caused Customer C to receive invoices that falsely claimed that RLI sold gold to Customer C and that Customer C received bonuses from RLI.  Doc. 50 at ¶ 46.

41.    Ramirez and RLI failed to pay any profit to Customer C, failed to pay back Customer C's principal and misappropriated $20,192 from Customer C and his spouse.  Doc. 50 at ¶ 47.

Customer D

42.    In March 2014, agents acting on behalf of Ramirez and RLI falsely told Customer D that Ramirez and RLI obtained gold at mines in South America and that Customer D could earn profits by purchasing gold through the MGD website.  Doc. 50 at ¶ 48.

43.     On or about March 5, 2014, using the MGD website, Customer D transferred $5,348 to RLI's bank account in Anguilla, controlled by Ramirez, in order to purchase four ounces of gold.  Doc. 50 at ¶ 49.

44.     Despite receiving funds from Customer D, Ramirez and RLI failed to purchase gold on behalf of Customer D and failed to deliver gold to Customer D.  Doc. 50 at ¶ 50.

45.     Between March and October 2014, Ramirez and RLI caused Customer D to receive invoices that falsely claimed that RLI sold gold to Customer D.  Doc. 50 at ¶ 51.

46.     Further, on October 6, 2014, Ramirez sent Customer D an email in which Ramirez promised to deliver to Customer D the gold promised by Ramirez and RLI.  Despite this promise, delivery never occurred.  Doc. 50 at ¶ 52.

47.     Ramirez and RLI failed to pay any profit to Customer D, failed to pay back Customer D's principal and misappropriated $5,348 from Customer D.  Doc. 50 at ¶ 53.

*Ramirez is Liable as a Controlling Person of GCI and RLI*

48.     Throughout the Relevant Period, Ramirez owned and controlled GCI; entered into agreements on behalf of GCI, including MOUs and PNs that he issued or caused to be issued to Defendants' customers; and, controlled GCI's bank account, which received funds from Defendants' customers for the purchase of gold.  Doc. 50 at ¶ 54.

49.     Throughout the Relevant Period, Ramirez owned and controlled RLI; told customers that he owned RLI; was RLI's President and Chief Executive; entered into agreements on behalf of RLI, including MOUs and PNs that he issued or caused to be issued to Defendants' customers; controlled RLI's bank account, which received funds from Defendants' customers for the purchase of gold; and, caused RLI to issue false documents to customers, including false invoices and emails.   In addition, Ramirez controlled the MGD website and he sent

communications to Defendants' customers about their gold purchases through RLI, including emails that contained material misrepresentations and omissions.  Doc. 50 at ¶ 55.

## III.    Standard of Review

The Federal Rules of Civil Procedure establish a two-step process for obtaining default judgment.  First, when a party against whom a judgment for affirmative relief is sought fails to plead or otherwise defend as provided by the Federal Rules of Civil Procedure, and that fact is made to appear by affidavit or otherwise, the Clerk enters default.  Fed. R. Civ. P. 55(a).  Second, after obtaining clerk's default, the plaintiff must move for default judgment.  Fed. R. Civ. P. 55(b).  Before entering default judgment, the court must ensure that it has jurisdiction over the claims and parties, and that the well-pled factual allegations of the complaint, which are assumed to be true, adequately state a claim for which relief may be granted.  *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).[2]

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.  8(a)(2).  This standard does not require detailed factual allegations, but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id*. (quoting *Twombly*, 550 U.S. at 570).  To state a plausible claim for relief, a plaintiff must go beyond merely pleading the "sheer possibility" of unlawful activity by a defendant and offer "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing

---

[2] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*Twombly*, 550 U.S. at 556). If a plaintiff fails to meet this pleading standard, then the plaintiff will not be entitled to default judgment.

If the plaintiff is entitled to default judgment, then the court must consider whether the plaintiff is entitled to the relief requested in the motion for default judgment. If the plaintiff seeks damages, the plaintiff bears the burden of demonstrating entitlement to recover the amount of damages sought in the motion for default judgment. *Wallace v. The Kiwi Grp., Inc.*, 247 F.R.D. 679, 681 (M.D. Fla. 2008). Unlike well-pled allegations of fact, allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages. *Id.* (citing *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999)). Therefore, even in the default judgment context, "[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters[.]" *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *see Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (explaining that damages may be awarded on default judgment only if the record adequately reflects a basis for an award of damages). Ordinarily, unless a plaintiff's claim against a defaulting defendant is for a liquidated sum or one capable of mathematical calculation, the law requires the district court to hold an evidentiary hearing to fix the amount of damages. *See Adolph Coors*, 777 F.2d at 1543-44. However, no hearing is needed "when the district court already has a wealth of evidence from the party requesting the hearing, such that any additional evidence would be truly unnecessary to a fully informed determination of damages." *See S.E.C. v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005); *see also Wallace*, 247 F.R.D. at 681 ("a hearing is not necessary if sufficient evidence is submitted to support the request for damages").

## IV.    Analysis

### A.  Jurisdiction

This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or of any rule, regulation, or order thereunder, the Commission may bring an action in the proper district court of the United Sates against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2012), because the Defendants resided or transacted business in this district and the acts and practices in violation of the Act and Regulations occurred within this District, among other places.

### B.  Default

In May 2018, Plaintiff served Defendants with the Amended Complaint via substitute service of process upon the Florida Secretary of State.  *See* Doc. 51.  Prior to doing so, Plaintiff engaged in a diligent search to locate Defendants and amended the Complaint to allege that Defendants are concealing their whereabouts.  *See* Docs. 50; 51.  This was proper service pursuant to Florida law.  *See* Fla. Stat. §§ 48.161(1), 48.181(1); *Great Am. Assurance Co. v. Walters*, No. 3:15-cv-1008-J-39JBT, 2016 WL 9526443, at *2-3 (M.D. Fla. Apr. 14, 2016) (providing that when attempting to effectuate service through the Florida Secretary of State, the plaintiff must allege facts in the complaint that bring the defendant within the purview of the relevant statute) (citation omitted); *Verizon Trademark Servs., LLC v. The Producers, Inc.*, No. 8:10-cv-665-T-33EAJ, 2011 WL 3296812, at *3-5 (M.D. Fla. Aug. 2, 2011) (applying the diligence standard).  Defendants failed to respond to the Amended Complaint.  *See* Fed. R. Civ. P. 12(a)(1)(A)(i).  Therefore,

Defendants are in default and the undersigned finds that the Clerk properly entered default against Defendant.

### C. Violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

Plaintiff alleges that Defendants violated 7 U.S.C. § 9(1)[3] and 17 C.F.R. § 180.1(a).[4] To establish a violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a), Plaintiff "must prove that [Defendants] made (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of [commodities], (3) made with scienter." *U.S. Commodity Futures Trading Com'n v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1346-47 (S.D. Fla. 2014); *see also U.S. Commodity Futures Trading Com'n v. Emini Experts, LLC*, No. 6:14-cv-1766-Orl-40GJK, 2016 WL 7666148, at *4 (M.D. Fla. Mar. 29, 2016) (citations omitted), *report and recommendation adopted*, 2016 WL 3098199 (M.D. Fla. June 3, 2016). Here, the well-pled factual allegations, set forth *supra*, establish that Defendants willfully and knowingly committed fraud in connection with commodity futures by knowingly making material misrepresentations and omissions in connection with the sale of gold, and by knowingly misappropriating investor

---

[3] 7 U.S.C. § 9(1) provides, in part, that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any . . . contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . ."

[4] 17 C.F.R. § 180.1(a) provides, in part, that "[i]t shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or . . . ."

funds.  Accordingly, the undersigned finds that Plaintiff has established that Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a), and, therefore, that Plaintiff is entitled to default judgment.

### D.  Liability of Defendants

The well-pled factual allegations establish that Ramirez committed his violation within the scope of his employment, agency, or office with GCI and RLI.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, GCI and RLI are liable for Ramirez's conduct.  *See Emini Experts, LLC*, 2016 WL 7666148, at *6.

Similarly, the well-pled factual allegations establish that Ramirez was the controlling person of GCI and RLI, and that Ramirez did not act in good faith at that time, and, indeed, knowingly induced, directly or indirectly, the acts by GCI and RLI that constituted violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  Therefore, pursuant to 7 U.S.C. § 13c(b), Ramirez is liable for the conduct of GCI and RLI.  *See Emini Experts, LLC*, 2016 WL 7666148, at *6 (citation omitted).

### E.  Relief

Plaintiff ask the Court to enter a permanent injunction, award restitution, and impose a civil monetary penalty.  The undersigned will address each request in turn.

#### 1.  Permanent Injunction

Pursuant to 7 U.S.C. § 13a–1, the Court has the authority to issue a permanent injunction against Defendants.  *See Emini Experts, LLC*, 2016 WL 7666148, at *6 (citation omitted).  The Eleventh Circuit has set forth the following factors to consider when determining whether to enter permanent injunctive relief:

> Such factors include the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of

the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Securities and Exchange Com'n v. Carriba Air, Inc*, 681 F. 2d 1318, 1322 (11th Cir. 1982) (citation omitted).

Here, Plaintiff's request for a permanent injunction is warranted. Defendants' conduct was both recurrent and egregious. Over the course of almost one year Defendants misappropriated more than one million dollars from investors by willfully and knowingly making material misrepresentations and omissions in connection with the sale of gold. Defendants' scheme required a high degree of scienter and Defendants have offered no assurances against future violations or recognition of the wrongful nature of their conduct. To the contrary, Defendants appear to be concealing their whereabouts, presumably to avoid taking responsibility for their actions. Given the foregoing, the undersigned finds that the factors weigh in favor of imposing a permanent injunction against Defendants.

Accordingly, the undersigned recommends that the Court enter a protective order permanently enjoining Defendants from directly or indirectly:

a.   Using or employing, or attempting to use or employ, manipulative or deceptive devices or contrivances, in connection with contracts of sale of a commodity in interstate commerce, namely gold, including: 1) misappropriating customer funds; 2) making material misrepresentations about, among other things, profits, the purchase of gold and the risks involved; 3) failing to disclose that Defendants did not use customers' funds to purchase gold on behalf of their customers; and 4) issuing invoices to customers that falsely state that RLI purchased gold on behalf of customers, in violation of 7 U.S.C. § 9(1) (2012) and 17 C.F.R. § 180.1(a) (2016).

b.   Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012));

c.   Entering into any transactions involving "commodity interests" for their own personal account or for any account in which they have a direct or indirect interest;

    d.      Having any commodity interests traded on their behalf;

    e.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    f.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    g.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2016); and

    h.      Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2016)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

### 2. Restitution

7 U.S.C. § 13a–1(d)(3)(A) permits Plaintiff to seek "restitution to persons who have sustained losses proximately caused by [Defendants'] violation (in the amount of such losses)." Here, Defendants' investors incurred losses in the amount of $761,832 related to the GCI Scheme and $1,980,859 related to the RLI Scheme.  Doc. 59-6 at 1-7, 32-38.

Accordingly, the undersigned recommends that the Court order the following:

    a.      Defendants Ramirez and GCI shall pay, jointly and severally, restitution in the amount of seven hundred and sixty-one thousand, eight hundred and thirty-one dollars ($761,831)[5] ("Restitution Obligation for GCI Scheme"), plus post-judgment interest.  Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order, pursuant to 28 U.S.C. § 1961 (2012).

---

[5] The undersigned notes that although Plaintiff's evidence states that Defendants' investors incurred losses in the amount of $761,832 related to the GCI Scheme, Plaintiff's Motion seeks only $761,831 in restitution related to the GCI Scheme.  Docs. 59 at 32; 59-6 at 7.

b. Defendants Ramirez and RLI shall pay, jointly and severally, restitution in the amount of one million, nine hundred eighty thousand, eight hundred and fifty-eight dollars ($1,980,858)[6] ("Restitution Obligation for RLI Scheme"), plus post-judgment interest.  Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order, pursuant to 28 U.S.C. § 1961 (2012).  Below, the Restitution Obligation for the GCI Scheme and the Restitution Obligation for the RLI Scheme are referred to collectively as the "Restitution Obligation."

c. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").   The Monitor shall collect restitution payments from Defendants and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

d. Defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "Carlos Javier Ramirez -- Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant(s) and the name and docket number of this proceeding.   Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

e. Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

---

[6] The undersigned notes that although Plaintiff's evidence states that Defendants' investors incurred losses in the amount of $1,980,859 related to the RLI Scheme, Plaintiff's Motion seeks only $1,980,858 in restitution related to the RLI Scheme.  Docs. 59 at 32; 59-6 at 7.

    f.      The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

    g.      The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

    h.      Pursuant to Rule 71, each customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

    i.      To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

### 3. Civil Monetary Penalty

7 U.S.C. § 13a–1(d)(1)(A) permits Plaintiff to seek a civil penalty "in the amount of not more than the greater of $100,000 or triple the monetary gain to the [defendant] for each violation." "A civil monetary penalty should be rationally related to the offenses or the need for deterrence." *See Emini Experts, LLC*, 2016 WL 7666148, at *7 (citation omitted).  Here, Plaintiff asks the Court to award a civil monetary penalty of $2,285,493[7] jointly and severally against Ramirez and GCI, and to award a civil monetary penalty of $5,942,574[8] jointly and severally against Ramirez and RLI.

---

[7] 3 * $761,831 = $2,285,493

[8] 3 * $1,980,858 = $5,942,574

Given the egregious and recurrent nature of Defendants' conduct, the undersigned finds that a civil monetary penalty of triple the monetary gain for each violation is appropriate. Accordingly, the undersigned recommends that the Court order the following:

a.  Ramirez and GCI shall pay, jointly and severally, a civil monetary penalty in the amount of two million two hundred eighty-five thousand four hundred ninety-three dollars ($2,285,493) ("CMP Obligation for the GCI Scheme"), plus post-judgment interest.  Post-judgment interest shall accrue on the GCI Scheme CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order, pursuant to 28 U.S.C. § 1961 (2012).

b.  RLI and Ramirez shall pay, jointly and severally, a civil monetary penalty in the amount of five million nine hundred forty-two thousand and five hundred seventy-four dollars ($5,942,574) ("CMP Obligation for the RLI Scheme"), plus post-judgment interest.  Post-judgment interest shall accrue on the RLI Scheme CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order, pursuant to 28 U.S.C. § 1961 (2012).  Below, the CMP Obligation for the GCI Scheme and the CMP Obligation for the RLI Scheme are referred to collectively as the "CMP Obligation."

c.  Defendants shall pay their CMP Obligations by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
   Division of Enforcement
   ATTN:  Accounts Receivables
   DOT/FAA/MMAC/AMZ-341
   CFTC/CPSC/SEC
   6500 S. MacArthur Blvd.
   Oklahoma City, OK 73169
   (405) 954-7262 office
   (405) 954-1620 fax
   nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding.

Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

### 4. Miscellaneous

In addition to the foregoing, Plaintiff included in its Proposed Order various miscellaneous provisions. Upon review, the undersigned finds that the following miscellaneous provisions are appropriate. Accordingly, the undersigned recommends that the Court order the following:

a.   Partial Satisfaction: Acceptance by the Commission or the Monitor of any partial payment of Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

b.   Notice: All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:
Rick Glaser, Deputy Director
U.S. Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, N.W.
Washington, DC 20581

Notice to the NFA:
Daniel Driscoll, Executive Vice President, COO
National Futures Association
300 S. Riverside Plaza, Suite 1800
Chicago, IL 60606-3447

All such notices to the Commission or the NFA shall reference the name and docket number of this proceeding.

c.   Change of Address/Phone: Until such time as Defendants satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Order, Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten (10) calendar days of the change.

d.   Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order

and the application of the provision to any other person or circumstance shall not be affected by the holding.

e.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

## V.    Conclusion

Accordingly, it is **RECOMMENDED** that the Motion (Doc. 59) be **GRANTED** as set forth in this Report and Recommendation, and that the Clerk be directed to close the case.

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on December 28, 2018.

DANIEL C. IRICK
UNITES STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy